UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| SCHUMACHER GROUP OF DELAWARE, INC. | CIVIL ACTION NO. 6:15-cv-2736 |
| VERSUS | UNASSIGNED DISTRICT JUDGE |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY | MAGISTRATE JUDGE HANNA |

## REPORT AND RECOMMENDATION

Currently pending before the Court are two Motions for Partial Summary Judgment filed by Liberty Mutual Insurance Company (LMIC) [Rec. Docs. 18 & 19] and one Motion for Summary Judgment filed by Schumacher Group of Delaware, Inc. (Schumacher) [Rec. Doc. 21 as amended Rec. Doc. 23]. All three motions are opposed. [Rec. Docs. 18, 19, and 25]. Reply briefs were allowed. [Rec. Docs. 37, 39, and 41]. With the retirement of Judge Doherty, the motions were referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court. For the following reasons, it is recommended all three motions be denied.

## BACKGROUND

This is an insurance coverage dispute. LMIC provided insurance coverage for business income loss to Schumacher, a company which contracted with hospitals to provide emergency and/or hospital medical services. One of the hospitals with which

Schumacher contracted was Crittenden Regional Hospital in West Memphis, Arkansas. In June 2014, a fire occurred at the hospital which caused damage that resulted in a period of time in which the services contracted for by Schumacher could not be performed. Schumacher made a claim under an endorsement in the policy for contingent business income loss arising from the loss of income it sustained as a result of the fire. It is undisputed that LMIC paid some proceeds in response to the claim pursuant to that endorsement. However, this dispute centers around Schumacher's contention that it is entitled to additional proceeds under the endorsement, based on its interpretation of the policy that the period of interruption was longer than the period for which it was provided proceeds by LMIC. LMIC contests this contention based on its interpretation of the policy and a number of facts many of which are clearly in dispute.

LMIC has filed two motions for partial summary judgment that are alternative claims for relief. In the first, LMIC essentially seeks a declaration that the period of recovery for which indemnity may be owed to Schumacher by LMIC ended no later than either July17, 2014, July 25, 2014, or December 19, 2014. [Rec. Doc. 18, p. 2]. In the second motion, LMIC contends that if the court grants its first motion, the second motion will be moot. [Rec. Doc. 19, p. 1]. In the alternative, if the court denies the first motion, LMIC contends that Schumacher cannot recover under its

Emergency Department Services Contract with Crittendon (the "Emergency Contract") for the period after the contract expired by its own terms on January 1, 2015. [Rec. Doc. 19, p. 2].

In its motion, Schumacher is essentially seeking a total ruling on the merits that it is covered up to the full sub-limits of the policy ($2,500,000.00), that LMIC breached its contract to provide coverage, and that Schumacher is entitled to judgment in its favor to be paid proceeds under the policy in the amount of $2,244,990.00. [Rec. Doc. 21, p. 3]. All three motions will be determined based on a reading of the pertinent policy language and the undisputed facts of record.

## LAW AND ANALYSIS

### A. The Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the

applicable governing law.[1] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[2]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[3] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[4] All facts and inferences are construed in the light most favorable to the nonmoving party.[5]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[2] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[3] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[4] *Washburn v. Harvey*, 504 F.3d at 508.

[5] *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

claim.[6] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[7]

## B. The Applicable Policy Language at Issue

LMIC issued policy number YU2-Z91-448627-034 to Schumacher covering the period from March 3, 2014 to March 3, 2015. [Rec. Doc. 21-2, p. 6]. The policy contains a Contingent Loss of Business Income or Extra Expense Extension which provides, in pertinent part, as follows:

> 2. If marked with an "x," we will pay for your loss of business income or extra expense that results from direct physical loss or damage to property of the type covered by this policy at a location shown on the Schedule of this endorsement from a peril insured against, which at the time of the loss: . . .
>
>    C. Prevents your direct customers from accepting your product(s) or service(s).
>
> 3. We will only pay for your loss of business income or extra expense covered by this endorsement during the period of time that:
>
>    A. Starts at the time of the direct physical loss or damage from a peril insured against to the property of the type covered by this policy at a location shown on the Schedule of this Endorsement; and

---

[6] *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[7] *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

    B. Ends when using reasonable speed and due diligence the property of the type covered by this policy at a location shown on the Schedule of this endorsement could be:

      (1) repaired or replaced; and

      (2) made ready for operations

    under the same or equivalent physical and operating conditions that existed prior to the damage by whichever individual(s) or entit(ies) may own (or otherwise be responsible for) the location shown on the Schedule of this endorsement. [Rec. Doc. 21-3, p. 303].

## C. **The Undisputed Facts**

It is undisputed that the fire occurred on June 6, 2014 and, therefore, the period of time described in Paragraph 3(A) commenced on that date. [Rec. Doc. 25-2, p. 5]. It is also undisputed that the hospital was closed in its entirety until July 18, 2014. [Rec. Doc. 25-2, p. 5]. The hospital units included 2 north patient rooms wing, 2 south patient rooms wing, emergency, surgery, radiology, and medical records. [Rec. Doc. 25-2, p. 3]. On July 18, 2014 the emergency department, radiology and 2 north patient rooms wing reopened; surgery reopened no later than July 25, 2014. [Rec. Docs. 25-2, p. 6; 27-1, p. 7].

LMIC paid Schumacher some proceeds under the endorsement for the period from June 6 through July 25, 2014. [Rec. Docs. 25-2, p. 14; 27-1, p. 7][8]. It is also undisputed that parts of the hospital were never repaired and others simply did not reopen. [Rec. Doc. 25-2, pp. 10-13, 27-1, pp. 6-10]. The hospital's board voted to permanently close the hospital on August 24, 2014, it finally closed its doors on September 7, 2014, and the hospital declared Chapter 7 bankruptcy on September 12, 2014. [Rec. Doc. 27-1, p. 11]. It is also undisputed that the fire did not cause the hospital to permanently close its doors. [Rec. Doc. 27-1, p. 10].

Schumacher had three different agreements with the hospital. One was an Emergency Department Services Agreement (the "Emergency Agreement"), which was the source for the provision of some physicians and medical records personnel at the hospital that became effective on January 1, 2010 and expired by its own terms on January 1, 2015. [Rec. Doc. 27-1, p. 3-4]. However, in opposition to LMIC's alternative partial motion for summary judgment, Schumacher contends that the Emergency Agreement might well have been renewed for 3 years. [Rec. Doc. 26, p. 10].[9]

---

[8] Schumacher disputes whether the amount paid by LMIC fully reimburses Schumacher for its business income loss during this time period. [Rec. Docs. 25-2, p. 15, 27-1, p. 7].

[9] Schumacher also appears to dispute the termination date because, after the hospital closed in September of 2014, there was no longer a need for a contract. [Rec. Doc. 27-1, p. 3].

The second agreement was a Hospitalist Professional Services Agreement, which became effective on March 22, 2012. [Rec. Doc. 27-1, p. 4]. LMIC contends this agreement expired by its terms on June 4, 2014 – prior to the fire – however, Schumacher contends the agreement auto-renewed for an additional year. [Rec. Doc. 27-1, p. 4].[10] Under this agreement, Schumacher provided physicians who were responsible for the hospital's "med-surg" population and generally did not work in the operating room but did work in the ICU, rehab, or skilled nursing facility unit otherwise referred to as the "med-surg units." [Rec. Doc. 27-1, p. 5].

The third agreement was a Care Management ECM Services Agreement which became effective on May 2, 2012; Schumacher stopped offering this service line on March 8, 2015. [Rec. Doc. 27-1, p. 5]. No Schumacher personnel actually worked in the hospital under this agreement; however, the services that were provided by Schumacher employees who had offices outside of the hospital were connected with and supported the work done by Schumacher personnel inside the hospital. [Id.]

While there is a great deal of dispute as to what "could have" been done after the fire, as well as a great deal of speculation as to what might have happened had the fire not occurred given the financial struggles the hospital had before and after the

---

[10] Schumacher appears to be correct although the citation to the record is not correct. The term of the contract, found at Rec. Doc. 18-3, p. 161, commenced on June 12, 2012 and ended on June 4, 2014. However, it did have an auto-renewal for one year.

fire, it is undisputed that the 2 south unit was not rebuilt after it was taken down to the studs after the fire, and further, that the hospital **could not** proceed with the repairs of the south unit by the time the hospital permanently closed. [Rec. Doc. 27-1, p. 6; 21-2, p. 6]. However, the south unit was, at a minimum, not being used to its capacity prior to the fire because of patient population shortages. The extent to which it was being used is a matter of dispute.

It is highly disputed whether Schumacher could perform its work under the Emergency, Hospitalist, and/or Care Agreements when the hospital reopened on July 18, 2014, or when the operating room reopened on July 25, 2014, "because the physical damage caused by the June 6, 2014 fire had not been repaired or replaced and made ready for operation under the same or equivalent physical and operating conditions that existed before the fire." [Rec. Doc. 27-1, pp. 8- 10].

Condensed to the lowest terms, Schumacher contends that it is entitled to additional policy proceeds beyond July 25, 2014 based solely on the language in paragraph 3(B) and the factual premise that all the repairs necessary to meet that standard had not been done. LMIC contends that this same language precludes payment of any further proceeds beyond December 19, 2014 at the latest. LMIC's analysis is also somewhat misplaced as it ignores the threshold inquiry that is found in Paragraph 2.

Therefore, the Court is called upon to determine the proper construction of not only Paragraph 3(B), but 3(B) read in conjunction with Paragraph 2, in order to determine the point when the loss ends. If no other repairs were ongoing and Schumacher still had a "loss of business income or extra expense from direct physical loss or damage to property" after July 18, 2014 or July 25, 2014, then the question is when "using reasonable speed and due diligence the property. . . could be: (1) repaired or replaced; and (2) made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage by whichever individual(s) or entit(ies) may own (or otherwise be responsible for) the location."

**D.    The Applicable Standard for Construction of Insurance Contracts.**

The interpretation of an insurance contract is a question of law.[11] This is a diversity suit regarding an insurance policy issued to a business with its principal place of business in Louisiana, and is thus governed by the substantive law of Louisiana.[12] Under Louisiana law, it is well-settled that the insured bears the burden

---

[11]    *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F.3d 742, 746 (5th Cir. 1999).

[12]    *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007); *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). LMIC does not argue for, or against, the application of Louisiana law.

of proving the existence of the policy and coverage while the insurer bears the burden of proving the applicability of any policy exclusions.[13]

LMIC's policy provisions must be interpreted in accordance with the familiar, well-established rules for interpreting insurance policies and other contracts.[14] An insurance policy is a conventional obligation, or contract, that constitutes the law between the insured and insurer; therefore, the agreement between the insured and the insurer governs the nature of their relationship.[15] Because insurance policies are contracts, they are interpreted under the same rules of construction that apply to other types of contracts.[16] The Louisiana Supreme Court long ago succinctly set forth the obligation of this Court:

> The role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the insured and insurer as reflected by the words in the policy. . . When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must

---

[13] *Tunstall v. Stierwald,* 2001-1765 (La. 02/26/02), 809 So.2d 916, 921; *Cochran v. B.J. Services Co. USA*, 302 F.3d 499, 502 -503 (5th Cir. 2002).

[14] *Times-Picayune Publ'g Corp. v. Zurich Am. Ins. Co.*, 421 F.3d 328, 331 (5th Cir. 2005).

[15] *Pareti v. Sentry Indemnity Co.,* 536 So. 2d 417, 420 (La. 1988); Louisiana Civil Code Article 1983.

[16] *Succession of Fannaly v. Lafayette Ins. Co.*, 2001-1144 (La. 1/15/02), 805 So. 2d 1134, 1137; *Ledbetter v. Concord Gen. Corp.*, 95-0809 (La. 1/16/96), 665 So. 2d 1166, 1169, *amended*, 95-0809 (La. 4/18/96), 671 So. 2d 915; *Reynolds v. Select Properties, Ltd.,* 634 So. 2d at 1183; *Smith v. Matthews*, 611 So. 2d 1377, 1379 (La. 1993).

enforce the contract as written and may make no further interpretation in search of the parties' intent.

Words in an insurance contract are to be given their generally prevailing and ordinary meaning, unless they have acquired a technical meaning . . . Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. . . . An insurance contract is construed as a whole and each provision in the policy must be interpreted in light of the other provisions so that each is given meaning. One portion of the policy should not be construed separately at the expense of disregarding other provisions. . . . An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion. . . . That is, the rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent. . . If, after applying the other general rules of construction, an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who furnished the policy's text and in favor of the insured finding coverage.[17]

### E.  The Policy is Not Ambiguous

Generally, business interruption insurance is "to do for the business what the business would have done for itself had no interruption occurred."[18] This underlying principle remains in play in this case; however, the provision at issue is slightly different from traditional business interruption coverage in that it is a business

---

[17] *Peterson v. Schimek,* 98-1712 (La. 03/02/99), 729 So.2d 1024, 1028-29 (citations omitted).

[18] Couch On Insurance, § 185:1, (3d Ed., 1998).

income loss tied to contingent property, i.e. property that is not owned by the policyholder at the time of the loss. Therefore, different considerations come into play on the part of both the policyholder and the insurer because neither can effectively control what the owner does with the property following a loss.

Both parties posit that the Court can, and should, decide as a matter of law when the interruption period ended in this case. LMIC picks three possible dates: July 17, 2014 – when parts of the hospital reopened but not the operating room; July 25, 2014 – when the operating room reopened; or at the very latest December 19, 2014 – when the entirety of the hospital "could have been" repaired had the hospital chosen to repair it. By its alternative motion, LMIC contends that in no event can the loss period end after the termination date of the Emergency Agreement.

Schumacher contends that the policy language must be construed such that, because the property was not repaired and made ready for operations under the same or equivalent conditions that existed prior to the fire, Schumacher continued to sustain business income losses even after the hospital permanently closed its doors for reasons *not* related to the fire on August 25, 2014. However, Schumacher's position is belied by the opening sentence in the "Argument" section of its opposition brief wherein Schumacher states: "Liberty Mutual sold to Schumacher group a coverage extension to insure against financial losses Schumacher Group sustains

when, *as a result of physical damage to a customer's property, the customer can no longer accept Schumacher' Group's services."* [Rec. Doc. 27, p. 5]. (Emphasis added).

If taken to its logical extension, Schumacher would contend (and has so contended) that even after the hospital closed its doors and liquidated its assets, Schumacher would still be entitled to ongoing business interruption proceeds if the hospital was not "(1) repaired or replaced; and (2) made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage." Such an interpretation completely reads out the words "could be" in the policy which immediately precede the two requirements.

First and foremost, Schumacher's entitlement to business interruption proceeds is directly tied to the "loss" described in Paragraph 2. If Schumacher returned to work at the hospital such that it had no "loss of business income or extra expense that results from direct physical loss or damage to the property," then by its terms the policy is not triggered for indemnity even if the property is not fully restored because Schumacher had no loss at that point. LMIC contends that Schumacher was doing everything it did before the fire – a point Schumacher contests – but LMIC does not provide undisputed evidence that Schumacher did not sustain any further losses. Assuming Schumacher is correct and it continued to sustain some loss of "business

income or extra expense that results from direct physical loss or damage to the property" after July 18 or 25, then the time period computations become applicable.

This Court agrees with LMIC's interpretation that the "could be" language is in the nature of a theoretical time period precisely because neither LMIC nor Schumacher were able to control what the hospital chose to do. If the owner chose not to effect any repairs because it was financially unable to do so, or it was not economically feasible, or the owner simply took an inordinate amount of time to make a decision as to what it should do, then the clause would be triggered to determine when the period ends based on when the property "could" have been repaired or replaced and made ready for operations using reasonable speed and due diligence.

Conversely, if the owner, as it did here, timely undertakes repairs, etc., and there comes a point when the property is "made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage," then that is, at least presumptively, the time in which it "could be" done for purposes of ending the period. More importantly, that unequivocally ends the time when the insurance proceeds are needed "to do for the business what the business would have done for itself had no interruption occurred" because there should be no more "business income loss . . . that results from *direct physical loss or damage*" to the

property. However, even if the property is not fully repaired, if the policyholder has no actual loss because it is able to generate the same amount of income as before the interruption, then by definition there is no need for business income replacement. Put another way, the policyholder cannot recover for a loss it no longer has even if repairs are ongoing.

Therefore, this construction gives meaning to all the words in the pertinent policy language and recognizes the reason for including a theoretical method to determine the end of the period – the complete lack of control over the owner's decision. The Court finds this language is not ambiguous.

F.  **There are Genuine Issues of Material Fact as to the Loss or when the Period Ended.**

The duration of the business interruption at issue in this case is properly a question of fact for the trier of fact to determine. Given the genuine issues of material fact relevant to these motions, this Court cannot make a finding on that issue as a matter of law. However, there are certain parameters that can be determined based on the record before the Court.

While there is a great deal in dispute as to what was done when and the effect of that work, it cannot be realistically disputed that the hospital could not accept Schumacher's services any earlier than the day the hospital reopened on July 18,

2014. It also cannot be realistically disputed that the hospital could not accept Schumacher's services after the doors were permanently closed on September 7, 2014 and the hospital commenced liquidation proceedings in bankruptcy under Chapter 7 on September 12, 2014. While the hospital may not have been able to accept Schumacher's services "as a result of physical damage to a customer's property" at that point, September 7 can provide an appropriate demarcation point from which the finder of fact can determine when the property "could be. . . repaired. . . and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage," if in fact that point had not already been reached, or Schumacher's losses had ceased even before the hospital closed.

The record contains a report that suggests that the south unit could have been repaired in 18 weeks, and that report forms the basis of LMIC's December 19, 2014 date. [Rec. Doc.27-1, p. 11]. However, that fact is disputed by the plaintiff because approvals and permits would have to have been obtained. [Id.] This Court is not prepared to accept or reject the December date presented by LMIC as an alternative ending date specifically because that fact is in dispute, and at the summary judgment stage, all inferences must be drawn in favor of the non-movant.

In addition, the Court does not agree that the interruption period ended with the termination period of the Schumacher Emergency Agreement as there is no basis, in

-17-

fact or in the language of the policy, for such a theory to apply. Rather, assuming that Schumacher continued to suffer a business income loss up until the time the hospital's doors closed, the evidence must establish to the trier of fact the earliest date when the property "using reasonable speed and due diligence . . . could be. . . repaired. . . and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage."

## CONCLUSION AND RECOMMENDATIONS

Whether the hospital had been sufficiently repaired for Schumacher to return to work with no business income loss or extra expense in July or sometime after that before the hospital's doors were permanently closed will have to be determined based on the evidence presented at trial, as this involves the determination of issues for the trier of fact to resolve. However, based on the clear language of the policy, if the business income loss did not otherwise end before the hospital closed its doors, then the trier of fact will need to determine when the payment period ended based on when the property "using reasonable speed and due diligence . . .could be. . . repaired. . . and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage."

IT IS THEREFORE RECOMMENDED that:

(1) The Motion for Partial Summary Judgment filed by LMIC [Rec. Doc. 18] be DENIED on the basis there are genuine issues of material fact;

(2) The Motion for Partial Summary Judgment filed by LMIC [Rec. Doc. 19] be DENIED as the date of the end of the contract is not a determining factor; and

(3) The Motion for Summary Judgment filed by Schumacher [Rec. Doc. 21] be DENIED on the basis there are genuine issues of material fact.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds

of plain error. See Douglas v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana on this 10th day of May 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE